**UNITED STATES of America, Appellee,**

**v.**

**William Eugene ROBINSON, Appellant.**

**No. 193, Docket 76–1177.**

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1976.

Decided Oct. 29, 1976.

Gregory B. Craig, Middlebury, Vt., for appellant.

Harold James Pickerstein, Chief Asst. U. S. Atty., D. Connecticut, New Haven, Conn. (Peter C. Dorsey, U. S. Atty., William F. Dow, III, Asst. U. S. Atty., D. Connecticut, New Haven, Conn., of counsel), for appellee.

Before SMITH, OAKES and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

On February 18, 1975, three armed men robbed the Trap Falls office of the Connecticut National Bank in Shelton, Connecticut, and fled with $2,034. Tellers, Retta Mondulick and Robert Welch, were present in the bank at the time of the robbery, and the entire 84-second incident was captured on film by a bank surveillance camera that was activated by Mrs. Mondulick when she saw the first man enter the bank.

Appellant Robinson came under suspicion as a result of an informant's tip. He sur-

rendered voluntarily after learning that the FBI had, with the consent of his wife, searched his apartment and taken his coat, which resembled a coat worn by one of the bank robbers.

At Robinson's first trial, the jury was unable to reach a verdict, and Judge Newman declared a mistrial. At a second jury trial before Judge Zampano, Robinson was found guilty of bank robbery in violation of 18 U.S.C. §§ 2113(a) and (b). Because certain erroneous evidentiary rulings prejudiced Robinson's alibi defense, we reverse his conviction.

## I. *The Third Man*

There is no dispute over the identity of two of the three bank robbers. One was Luther Fleming, who is apparently still at large. The other was David Tate, who pled guilty and was given a ten year sentence.[1] Tate did not testify at Robinson's first trial.

On the day after the bank robbery, the FBI took a bank surveillance photograph to the Bridgeport jail and enlisted the aid of Correctional Officer George Maher and his staff in identifying the third man involved in the robbery. Maher was prepared to testify that, based on an examination of their files, he and his staff concluded that the individual in the picture resembled one Eli Turner. If Judge Zampano had admitted the evidence of the resemblance to Turner, the government would have stipu-

lated that Bridgeport Police Captain Anthony Fabrizi, if called, would testify that Eli Turner was suspected of committing two local armed robberies in early February, 1975, and was still at large. Judge Zampano excluded Maher's testimony because he was concerned that its admission would open the door to testimony by numerous witnesses that the bank surveillance photographs either did or did not resemble Robinson. On appeal, Robinson claims that the exclusion of the Maher/Fabrizi testimony was error. We agree.

The central issue in this case was one of identification. The government maintained that the third man in the bank was Robinson, and Robinson claimed that it was not. Robinson's claim was more plausible than it might at first appear. The photographic identification procedures employed by the FBI had been mildly suggestive, and the defense argued that the in-court identifications made by the two tellers were the products of pretrial misidentification.[2] The bank surveillance photographs were of such quality that the defense was able to argue to the jury that an examination of the film would prove that the third bank robber was not Robinson. The testimony of Tate, who agreed to testify on the eve of the second trial, was subject to attack on the ground that it was the product of a "deal" with the government.[3]

▉▉▉ It was entirely proper for Robinson to disprove the government's contention by proving that the third man was someone

---

1. Tate pled guilty to violating 18 U.S.C. § 2113(b). After Robinson's first trial, Tate was given a sentence of ten years, the maximum under § 2113(b).

2. Robinson concedes that the identification procedures were insufficiently suggestive to warrant the suppression of the tellers' identifications as a matter of law. He assigns as error, however, the trial judge's refusal to give certain jury instructions based on *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Whether a failure to give such an instruction constitutes reversible error depends on the circumstances. *United States v. Fernandez*, 456 F.2d 638, 644 (2d Cir. 1972). In view of our disposition of this case, we need not decide whether the failure to give the requested charge was error.

3. Shortly after the first trial, Tate was called before a Grand Jury, granted immunity and eventually adjudged in contempt when he refused to testify. He was committed to custody for the life of the Grand Jury and he faced the prospect of future commitments if he persisted in refusing to testify before future Grand Juries. Under the terms of his sentence for contempt, Tate's sentence for bank robbery was not to begin until after his sentence for contempt expired. By testifying at the second trial, Tate purged himself of contempt, and the government agreed not to oppose his motion for a reduction in sentence. His sentence under 18 U.S.C. § 2113(b) was subsequently reduced to six years.

else. 1 J. Wigmore, Evidence § 34 (3d ed. 1940) [hereinafter cited as Wigmore]; 2 Wigmore § 413. If it was, then obviously Robinson was innocent. Evidence to the effect that the third man in the bank resembled an individual suspected of two armed robberies that occurred in the Bridgeport area within six days prior to the bank robbery was clearly probative of the issue Robinson sought to prove, namely, that the third man was someone else.

■ The reasons given by Judge Zampano for the exclusion of this evidence were based upon his desire to avoid repetitive opinion testimony by witnesses for both the prosecution and the defense concerning whether or not Robinson resembled the individual in the bank surveillance photographs. This concern was, of course, legitimate.[4] The jury could look at the pictures and look at Robinson and decide that issue for itself. The Advisory Committee Notes to Fed.R.Evid. 701 indicate that if "attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule." However, the Maher/Fabrizi testimony had a different purpose. Maher was going to testify about the resemblance of the individual in the picture to Turner, not Robinson. Turner was not before the court, and he could not have been brought to court because he was still at large. The comparison that Maher was going to make was one which the jury could not have made for itself, so his testimony did not suffer from a "lack of helpfulness." The reasons given by Judge Zampano for the exclusion of the Maher/Fabrizi testimony simply do not justify his evidentiary ruling.

■ The government argues that opinion testimony based on only general features is inadmissible, particularly when the opinion comes from a lay witness. Even assuming the correctness of that proposition, see note 2 *supra*, we cannot agree that it is dispositive on the facts of this case. As indicated above, Maher was not going to testify about the defendant, he was going to testify about another individual. His opinion was "rationally based on [his] perception" because he had seen Turner, and it was "helpful to . . . the determination of a fact in issue" because Turner was unavailable. Therefore, his opinion was admissible under Rule 701, and it would not have been "objectionable because it embrace[d] an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704. We cannot agree with the government that Maher's testimony amounted to "meaningless assertions which amount to little more than choosing up sides." Advisory Committee Notes to Rule 701. On the contrary, it was testimony from a disinterested government official that bore directly on the principal issue in the case, namely, the identity of the third man in the bank.

## II. *Unemployment Records*

Joseph Burroughs testified that he had been with Robinson on the day of the bank robbery. He said that he remembered the date because he had picked up an unemployment check on that day. The government sought to discredit Burroughs' testimony by proving that he had not received an unemployment check on the day of the robbery. Walter Glennon, an employee of the Connecticut Labor Department, testified, on the basis of certain records from the Labor Department, that Burroughs had received no unemployment checks between February 10 and August 4, 1975. That

---

4. We note that the first time anyone offered evidence of that kind was at the first trial when, over the objection of defense counsel, the government introduced the testimony of a Bridgeport police officer who said that he recognized the individual in one of the bank surveillance photographs as Robinson. The government's argument at the first trial, of course, was somewhat different from the one they advance on this appeal. Nevertheless, we are inclined to agree with the government that, despite the broad language of Fed.R.Evid. 701, it is not improper to exclude the testimony of lay witnesses asked to render an opinion whether the individual in a bank photograph is the defendant. Our agreement with that abstract proposition does not help the government, however, for it is inapplicable to the facts of this case.

testimony and the records on which it was based were admitted over the objection of defense counsel.

■ It was of course proper for the government to try to impeach Burroughs' testimony by proving that he had not received a check on the day of the bank robbery, and it was also proper for the government to prove non-receipt by proving that there was an absence of any record indicating receipt. *United States v. DeGeorgia*, 420 F.2d 889 (5th Cir. 1969); McCormick, Evidence § 307, at 722 (2d ed. 1972); 5 Wigmore §§ 1531, 1556, 1633(6), 1678(7). The absence of a record of an event which would ordinarily be recorded gives rise to a legitimate negative inference that the event did not occur. Fed.R.Evid. 803(10) creates an exception to the hearsay rule specifically designed to cover the situation presented here:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

.    .    .    .    .

(10) Absence of public record or entry. To prove the   .   .   .   nonoccurrence .   .   .   of a matter of which a record .   .   .   was regularly made and preserved   .   .   .   evidence in the form of a certification in accordance with Rule 902 [self-authentication], or testimony, that diligent search failed to disclose the record   .   .   ..

■ Thus, if Glennon had merely testified that his agency regularly made and preserved records of unemployment payments and that a diligent search of those records failed to disclose any record of a payment to Burroughs on the day of the robbery, then the government would have

made its point. There is some indication in the record that the individual who actually conducted the records search, and who gave the records to Glennon, had concluded that the records were "confused" and "indefinite," and was of the opinion that "[a]lthough there are no records of payments this doesn't mean that no payments were made." That evidence was properly excluded by the trial judge.[5] It perhaps explains, however, why the government chose to use Glennon as a witness instead of the person who actually made the search, and why the government approached this issue in the fashion that it did, instead of using the simple procedure approved by Rule 803(10).

The records that were given to Glennon, and upon which Glennon based his opinion, did not affirmatively state that Burroughs had not received a check on the day of the robbery. They merely indicated that checks had been received on certain dates, and the date of the bank robbery was not one of those dates. Thus, Glennon's testimony was based upon the negative inference that, since the records in his possession contained no record of payment, no payment had been made. Glennon testified, however, that the records he had been given were incomplete, and he said the records had merely been presented to him "as [Burroughs'] records for unemployment." He gave no testimony at all concerning the manner in which the search was made or whether a search was made of all of Burroughs' records or whether the search was diligent. Moreover, he testified that certain records, including cancelled checks, check vouchers and claims presented by applicants when payments are made, were not in the file he brought to court.

---

5. The person who actually made the search was William Kegler of the State Labor Department. Robinson's investigator, Robert E. Porter, interviewed Kegler and prepared a memorandum indicating that Kegler had expressed the opinions quoted above. During the cross-examination of Glennon, defense counsel asked whether Kegler had expressed those opinions to Glennon. Glennon said that he and Kegler had not discussed the matter. After Glennon testified, defense counsel sought a continuance for the purpose of bringing Kegler into court. Counsel explained that Kegler was not under subpoena because the defense had expected Kegler to be the government's witness. When the request for a continuance was denied, defense counsel sought to introduce testimony from Porter. That testimony was properly excluded as hearsay. Robinson assigns the denial of a continuance as error. Because we hold that Glennon's testimony was inadmissible, we need not reach that question.

Judge Zampano decided to allow Glennon to testify on the basis of the incomplete file, and he explained to defense counsel that the trustworthiness of the records was a question of weight for the jury which the defense would be permitted to explore on cross-examination. This was error. Evidence that is otherwise admissible under an exception to the hearsay rule is admissible primarily because evidence of that kind is generally trustworthy, but if, in a particular instance, the circumstances indicate a lack of trustworthiness, the evidence should be excluded. *See United States v. DeGeorgia*, 420 F.2d 889, 895–96 (5th Cir. 1969), (Ely, J., concurring). The question of trustworthiness is a crucial threshold issue of law going to admissibility, and it must be resolved first by the trial judge before it becomes a question of weight for the jury.

Trustworthiness, in this context, relates to the thoroughness or diligence of the records search. Compare Fed.R.Evid. 803(7) with Fed.R.Evid. 803(10). It hardly requires extended discussion to demonstrate that a casual or partial search cannot justify the conclusion that there was no record. Although the possibility that the Labor Department records in Glennon's possession failed to reflect a payment actually made may have been small, the damage caused by an error, *i. e.*, the impeachment of Robinson's only alibi witness, far outweighs the possible inconvenience of conducting the diligent search anticipated by Rule 803(10).

Rule 803(10) makes evidence based upon a diligent search admissible without specifically making evidence based upon a search that is less than diligent inadmissible. It may be, therefore, that evidence of the latter sort should not necessarily be inadmissible. The Federal Rules of Evidence were not, of course, designed to render the law of evidence intransmutable. Indeed, Fed.R.Evid. 102 directs that the rules be construed so as to promote the "growth and

development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Diligence is the standard set by Rule 803(10),[6] however, and it is a good one. It insures that evidence of this kind will be reliable, and reliability is the foundation upon which all exceptions to the hearsay rule are built. Accordingly, we decline to enlarge the exception created by Rule 803(10) and hold that proof of a search that has been less than diligent is inadmissible to prove the absence of a record.

### III. *Prejudice*

Defense counsel duly objected to the admission of the Glennon testimony, and, although his offer of proof with respect to the Maher/Fabrizi testimony was not made until the day after Maher's testimony was excluded, the delay was due to the fact that counsel did not wish to make the offer with the jury present. Judge Zampano properly treated the offer as having been timely made. The only remaining question, therefore, is whether the trial court's erroneous rulings affected a substantial right of the defendant. Fed.R. Evid. 103(a). We hold that they did.

The Maher/Fabrizi testimony alone could have created a substantial doubt in the minds of the jurors.[7] The impact of the erroneous exclusion was aggravated by the fact that the government objected to Maher's testimony immediately after Maher testified that he and his staff at the Bridgeport jail had examined their photo files and concluded that the man in the bank surveillance photograph resembled "him," but before Maher was able to explain that "him" was Turner, an individual about whom the jury knew nothing. Therefore, Maher's testimony, instead of benefiting the defense, may well have left the jury with the impression that "him" was Robinson and that Robinson was known to the Bridgeport correctional authorities. Considering the effect the Maher/Fabrizi testimony might

---

6. See also 5 Wigmore § 1678(7).

7. During the first trial, after which the jury was unable to reach a verdict, this same evidence was elicited through a different witness, over the government's objection.

have had, and the point of interruption, it is clear that the exclusion of that testimony severely prejudiced Robinson's alibi defense.

The admission of Glennon's testimony also prejudiced the defendant. Burroughs was Robinson's only alibi witness, and the link that connected the alibi with the day of the robbery was Burroughs' receipt of an unemployment check. By impeaching Burroughs with respect to the unemployment check, the government cut the heart out of Robinson's alibi. There is, of course, nothing wrong with that, as long as it is done with admissible evidence. Here it was not. When a defendant's alibi is destroyed, and inadmissible hearsay is the instrument of destruction, it is beyond dispute that a substantial right of the defendant has been affected. *See Cannady v. United States,* 122 U.S.App.D.C. 99, 351 F.2d 796 (1965).

Reversed and remanded.