**STATE of Missouri, Plaintiff-Respondent,**

v.

**Clarence Mitchell BARNES, Defendant-Appellant.**

**No. 11266.**

Missouri Court of Appeals, Southern District, Division Four.

April 16, 1980.

Dwight Douglas, Douglas, Douglas & Johnson, Neosho, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, III, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Chief Judge.

"Barry Colvin will you stand up?" said the prosecutor at the outset of his final argument to the jury. A man sitting in the back row of the courtroom stood up. Defendant claims this incident deprived him of his right to a fair trial. The state, conceding the error, claims it was harmless. This court agrees with defendant.

In the trial of a lawsuit there is a time to introduce evidence and a time to make a final argument. They do not coincide.

The jury found defendant guilty of forgery, (§ 561.011 RSMo 1969), and he was sentenced to five years' imprisonment. Defendant appeals.

Defendant's first point in his excellent brief is that the trial court erred in denying defendant's motion for a mistrial based upon the incident occurring during the prosecutor's closing argument. The validity of defendant's first point requires reversal and remand and makes it unnecessary to consider the remaining points which, if they arise at all on new trial, may not arise in the same manner.

During the trial, and on this appeal, defendant was represented by attorney Dwight Douglas. During Mr. Douglas' clos-

ing argument he said, "We did have mention, didn't hear any more about Barry Colvin, son of Beryl Colvin, who lived in West Plains. Barry Colvin was living in West Plains with his mother and then he lived in Texas and he had as much access to this draft as did anyone else. I am not telling you that he did it; I am not pointing a finger; I am just saying that he had as much access to the check and so did several people."

After Douglas completed his closing argument, the prosecutor arose to address the jury. The following transpired:

"PROSECUTOR: Barry Colvin will you stand up?

MR. DOUGLAS: Your Honor, I object to any demonstration.

THE COURT: Sustained.

MR. DOUGLAS: And I am further going to move for a mistrial.

PROSECUTOR: I didn't open up the discussion about Barry Colvin; Mr. Douglas did in this particular case.

THE COURT: Request for mistrial will be denied and you will be seated.

MR. DOUGLAS: I would ask that the jurors be instructed to disregard the demonstration.

THE COURT: Ladies and gentlemen of the jury, you will disregard the demonstration."

After the jury retired to deliberate, the following transpired:

"MR. DOUGLAS: We would like for the record to reflect, Your Honor, that during the closing argument [the prosecutor] directed an individual sitting in the back row of the courtroom, being a male individual unknown to me to or to the defense, and he did rise at the instruction of [the prosecutor] and thereby precipitating the objection the defendant made. I would like for the record to so reflect."

The prosecutor, who was present when the statement was made, made no attempt to correct Mr. Douglas' description of the occurrence.

In *State v. Mayfield*, 506 S.W.2d 363 (Mo. 1974) a murder conviction was reversed because of misconduct on the part of the prosecutor. During his closing argument, the prosecutor "suddenly pulled out from under his coat and waved before the jury a not-in-evidence and unidentified sawed-off shotgun, asking how many had seen it concealed while he was talking to them." The prosecutor was attempting to show that the defendant, charged with murder committed during a holdup, could have entered a cafe and taken a seat at the counter while concealing a sawed-off shotgun under his coat.

The supreme court, at p. 365, held that the prosecutor "went far beyond the permissible bounds of oral argument. He, in effect, was conducting an experiment in front of the jury with no factual basis to support it whatever."

In its brief as respondent the state, with commendable candor, says, "The prosecutor's action was beyond the limits of proper conduct." The state argues that the prosecutor's conduct "was invited error, provoked by previous misconduct by counsel for defendant." The state argues that the error was cured by the court's sustention of defendant's objection and by the court's instruction to the jury to disregard the incident. The state also says that the error was not prejudicial.[1]

To examine the merits of the state's assertions it is necessary to review the facts surrounding the commission of the offense and the manner in which the evidence was presented at the trial. It is also necessary to see what connection Barry Colvin had with the case and what may have prompted the prosecutor to resort to a stratagem which may appeal to a writer of a television script but which has no place in a court of justice.

In February 1977 Charles Colvin died, survived by his widow Beryl Colvin. Charles Colvin was the insured under a

1. See, generally, 46 A.L.R.2d 1423—"Prejudicial effect of prosecuting attorney's misconduct in physically exhibiting to jury objects or items not introduced as evidence."

$21,000 life insurance policy issued by MFA Life Insurance Company. Beryl Colvin, the beneficiary, made a claim for the policy proceeds. On March 21, 1977, MFA placed in the mail a $21,000 check payable to Beryl Colvin. She was then living with her 32-year-old son Barry Colvin in Pottersville, which is about 12 miles west of West Plains. Mrs. Colvin's mailing address was Box 103, Pottersville, but apparently the check was sent to Box 103, West Plains. Mrs. Colvin never received that check. Prior to the trial she had lived in West Plains.

On Thursday, March 24, 1977, a new customer entered the First National Bank in Neosho, Missouri. He had with him the check issued by MFA. The customer told bank employee Joyce Spittler, who was in charge of opening new accounts, that he wanted to open a savings account. He said he was Beryl Colvin. Under Joyce's supervision the customer filled out the appropriate forms. He also presented her the check which she took to a bank officer, Harry Hadley, "to have it okayed." Hadley talked with the customer for several minutes. A savings account was opened, the customer endorsed the check with the name "Beryl Colvin" in Joyce's presence, filled out a signature card and deposit ticket in that name, deposited $20,000 in a savings account, and received $1,000 in cash. The dealings of the customer with Joyce and Hadley lasted 30 to 45 minutes.

On Friday, March 25, 1977, the customer returned to the bank and talked again with Joyce. He wanted to withdraw some money so that he could pay some bills. The customer again conferred with Hadley. Three money orders were prepared and they were in the respective amounts of bills which the customer said he had to pay. On this visit Hadley activated the bank's surveillance camera and took several photographs of the customer. These photographs were later admitted into evidence.

Later Friday afternoon the customer went to the bank's drive-in facility where he again encountered Joyce and complained that he was having trouble cashing the money orders. Joyce referred the customer to Hadley, who was also at the drive-in, and a ten-minute conversation took place between Hadley and the customer. Hadley recommended that the customer place the money back in the savings account and wait at least 15 days for the MFA check to clear. The customer said he would keep the money orders and departed. Later the bank paid two of the money orders.

On April 25 Mrs. Colvin telephoned the MFA Life Insurance claims manager in Columbia and asked why she had not received the insurance proceeds. The claims manager told her, "I have the check in front of me. You have already cashed it and your signature is on it."

On May 16, 1977, the complaint was filed and defendant, who was then living in West Plains, was arrested. On May 19 a lineup was conducted and Hadley and Joyce identified defendant as the bank customer. The information was filed on June 16, 1977. After discovery had been conducted the defendant, on August 21, 1978, filed a motion to suppress the lineup identification. The same day the court held a hearing on the motion and received the testimony of Joyce and Hadley. At the conclusion of that hearing the court sustained the motion to suppress the lineup identification but added, "I will not at this time suppress any in-court identification, based on what has been offered here today."

The trial commenced on November 13, 1978. Before the jury was selected the prosecutor told the court, "The issue in the case has been from the very beginning one of identification."

Testifying for the state, Joyce identified the defendant as the bank customer. During the course of her testimony she identified the surveillance photographs, state's Exhibits 7, 8, 9, and 10, as being fair representations of the customer. She said that defendant had changed his appearance between the date of the offense and the date of the trial. At the time of the bank dealings the defendant had long hair and a mustache. The photographs showed that the bank customer had long hair and a mustache. At the trial the defendant was cleanshaven and had short hair.

Hadley, testifying for the state, identified the defendant as the bank customer. During the course of his direct examination the prosecutor again utilized the bank photographs and Hadley identified them as being fair representations of the bank customer. He also mentioned the change in physical appearance between the date of the offense and the date of trial.

Another witness for the state gave his opinion that the handwriting on the check and the bank forms was that of the defendant.

The prosecutor then called Zeral Mullins, a West Plains policeman, who said that he was acquainted with the defendant. Using Exhibit 7 the prosecutor asked Mullins, "Who is that person?" Attorney Douglas objected to the question on the ground that it invaded the province of the jury and the court sustained the objection.[2] The court did permit Mullins, over defendant's objection, to testify that he knew the person shown in Exhibit 7 and that it was a fair representation "of the person I know it to be." The court denied the request of defendant's counsel to strike the witness' testimony concerning the bank photograph.

After the state rested the defendant, age 30, testified in his own behalf and denied being the bank customer. He claimed that on the date of the offense he was in Pomona, Kansas. Two defense witnesses lent some support to that alibi.

During the brief cross-examination of the defendant the prosecutor utilized the bank photographs and the defendant denied that they depicted him. The prosecutor asked defendant if he knew Barry Colvin and he said he did not. Four of the prosecutor's questions mentioned Barry Colvin.

After the defense had rested the prosecutor again called witness Mullins, showed him Exhibit 7, and asked if he knew the person shown in the photograph. Defendant's attorney again objected and the objection was sustained.

The third and fourth sentences of the prosecutor's opening argument to the jury were, "I think the situation boils down to this in this particular case—primarily an issue of identification of the defendant, whether or not the defendant in this case, Clarence Mitchell Barnes, is the one who committed the crime." Earlier in this opinion the reference to Barry Colvin by defense counsel Douglas in his closing argument and the misconduct of the prosecutor in his final argument have been described.

The record contains no photograph of Barry Colvin, nor was there testimony concerning his description other than his age. There is no sworn testimony on whether the man in the back of the courtroom, who stood up at the prosecutor's request, was Barry Colvin.

**2.** Although the propriety of the court's ruling is not directly in issue on this appeal, and is not ruled, the following cases deal with surveillance photographs taken during the course of bank holdups and with the admissibility of testimony of a lay witness to the effect that the person shown in the photograph is the defendant. In *United States v. Murray*, 523 F.2d 489 (8th Cir. 1975); *People v. van Perry*, 60 Cal. App.3d 608, 131 Cal.Rptr. 629 (1976); *State v. Demouchet*, 353 So.2d 1025 (La.1977); and *State v. Jamison*, 23 Wash.App. 454, 597 P.2d 424 (1979), the testimony was held admissible. In *United States v. Robinson*, 544 F.2d 110 (2d Cir. 1976), there is dictum to the effect that the testimony is inadmissible. In *United States v. Calhoun*, 544 F.2d 291 (6th Cir. 1976), the court said that if the testimony was admissible it "teases the outer limits of Rule 701" of the Federal Rules of Evidence and held it was prejudicial error to admit it under the facts. Rule

701 deals with opinion evidence of lay witnesses. In *United States v. Butcher*, 557 F.2d 666 (9th Cir. 1977), the admissibility issue was not decided but the court said that the error, if any, was harmless. The court also said that lay opinion identification by a policeman is not to be encouraged and should be used only if no other adequate identification testimony was available.

In *Calhoun, Butcher, Demouchet*, and *Jamison*, the witness was not present at the crime but was previously acquainted with defendant. In *van Perry* the witnesses interpreting the photographs included prior acquaintances of the defendant and a witness to the offense. In *Murray* a witness to the offense interpreted the photograph. In *Robinson* the defendant offered testimony from Maher to the effect that the person shown in the bank photograph was one Turner and not the defendant. It was held that the trial court erred in rejecting the offer.

At the hearing on the motion for new trial the prosecutor said, "I did not find out where Barry Colvin was, did not ever talk to him personally until the day he appeared here in the court and I only found out where he was the Saturday of the week before the trial. *His appearance was only as a rebuttal witness.*"

In view of the foregoing statement of the prosecutor, it appears that the person who stood up was Barry Colvin. The effect of the episode was to transmit, from that person to the jury, this unsworn testimony: "I am Barry Colvin, this is what I look like, make your own determination of whether I am the person depicted in the bank photographs."

Three months before the trial the defendant filed a motion for a continuance and the motion was sustained. One of the grounds of the motion was that the defendant needed to locate Barry Colvin. Five days before the trial a second motion for continuance was filed and again one of the grounds assigned in it was that the defendant was trying to locate Barry Colvin. That motion was overruled. Barry Colvin was not endorsed on the information as a witness for the state, nor was he disclosed as a witness for the state in the state's response to defendant's request for disclosure.

The prosecutor had strong eyewitness testimony from Joyce Spittler and Harry Hadley to the effect that the defendant was the bank customer. The prosecutor apparently was not satisfied with the cogency of that evidence. Throughout the trial the prosecutor emphasized the bank photographs and tried, without success, to introduce the testimony of other persons to the effect that they were acquainted with the defendant in 1977 and that the defendant was the person shown in the photographs.

There is no merit in the claim that attorney Douglas was guilty of misconduct in referring to Barry Colvin in his final argument. Douglas merely said that Barry Colvin was living with his mother and that Barry Colvin "had as much access to this draft as did anyone else." However tenuous such an argument might have been, it cannot properly be said that Douglas was guilty of misconduct in making it.

Identification of the bank customer was the central issue in this case. The bank photographs played a major role in that issue. Although the jury saw the photographs and saw the defendant, the prosecutor must have felt that the state's case was not so convincing that it would not derive benefit from the incident under criticism.

The following language, contained in *State v. Mayfield*, supra, 506 S.W.2d at p. 366, is apposite and controlling:

"The record does not demonstrate that the jury disregarded or could not have been influenced by the exhibition, and error of this kind, quite similar to error in admission of evidence, should not be declared harmless unless it is so without question. *State v. Degraffenreid*, 477 S.W.2d 57 (Mo. banc 1972). Additionally, to hold that this is no more than harmless error would only encourage such actions in future cases and we do not believe this should be done."

The judgment is reversed and the cause remanded.

BILLINGS, MAUS, GREENE and PREWITT, JJ., concur.