**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Marshall JACKSON,
Defendant-Appellant.**

No. 81–1750.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1982.

Decided Sept. 15, 1982.

Rehearing and Rehearing En Banc
Denied Dec. 1, 1982.

Jeffrey Blumenthal, Chicago, Ill., for defendant-appellant.

Richard Miller, Asst. U. S. Atty., Dan K. Webb, U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before ESCHBACH, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and SHADUR,* District Judge.

ESCHBACH, Circuit Judge.

The defendant Marshall Jackson was convicted after trial to a jury of bank robbery and assault by use of a dangerous weapon in violation of 18 U.S.C. §§ 2, 2113(a) and (d). On appeal Jackson contends that the district court committed reversible error by permitting a lay witness, Louise Heneghan, to testify that the defendant was one of the robbers pictured in the bank surveillance photographs of the robbery. We affirm.

On April 30, 1980 three men, one of whom was carrying a gun, robbed the Broadway Bank at 5960 North Broadway in Chicago, Illinois of $28,240.75. During the course of the robbery one of the bank tellers activated the bank's surveillance camera which photographed the remainder of the robbery.

The defendant was arrested on January 5, 1981 and charged with participating in the robbery of the Broadway Bank. He entered pleas of not guilty as to both the bank robbery charge and the charge of assault with a dangerous weapon, contending that the government had erred in its identification of him as one of the robbers. The man photographed by the bank surveillance cameras as the robber who actually collected the money from the bank tellers, who the government contended was the defendant, had a full beard and mustache and was quite heavy-set. Jackson appeared with long sideburns and a Fu Manchu style mustache in the photograph of him taken on the day of his arrest, January 5, 1981. At the pre-trial line-up held in February 1981 Jackson had shorter hair and long sideburns

---

* The Honorable Milton I. Shadur, District Judge for the Northern District of Illinois, Eastern Division, is sitting by designation.

but no facial hair. Both the arrest and line-up photographs depict the defendant as somewhat heavy-set.

At trial the government presented three witnesses who testified, to varying degrees of certainty, as to the identification of Jackson as the robber who collected the cash from the tellers: Alice Koch, one of the tellers, Vicki Liberman, another bank employee, and Louise Heneghan. Ms. Koch, who was one of the tellers from whom a portion of the cash was taken during the robbery, testified that she had positively identified the defendant in the February line-up. She stated that the defendant differed in appearance from the bank robber to the extent that the bank robber had a beard and mustache. Ms. Liberman, who witnessed a portion of the robbery, could not make a positive identification from the line-up, but testified that the eyes of the defendant "resembled" those of the robber who was at the teller window. She also stated, however, that the defendant differed from the robber in that the former had no facial hair, had shorter hair and appeared smaller than the robber.

The third witness to testify as to the identification of the defendant was Louise Heneghan, who was not an eyewitness to the robbery. She testified that she had met the defendant, whom she knew as "Tiny", only one time, on December 29, 1979 at a Christmas party. In December 1980 the FBI had shown Ms. Heneghan a photograph of the individual who took the cash from the tellers and at that time she identified the man in the photograph as the man she knew by the name of Tiny. She also identified the defendant as Tiny in the courtroom.[1]

In addition to the testimony of witnesses Koch, Liberman and Heneghan, the district court admitted as exhibits a number of bank surveillance photographs of the actual robbery, a photo of the defendant on the day of his arrest and pictures of the February line-up in which the defendant participated.

The sole issue raised on appeal is whether the district court committed prejudicial error in admitting the testimony of Louise Heneghan.

Rule 701 of the Federal Rules of Evidence authorizes the admission of opinion evidence by a lay witness where the witness' opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." 28 U.S.C. § 701. The decision of whether or not to admit certain testimony under Rule 701 is committed to the sound discretion of the district court, and we may not reverse absent a finding that the lower court abused its discretion. *Bohannon v. Pegelow*, 652 F.2d 729, 732 (7th Cir. 1981); *United States v. Skeet*, 665 F.2d 983 (9th Cir. 1982); *United States v. Borrelli*, 621

---

1. Ms. Heneghan testified as follows:

DIRECT EXAMINATION:

\* \* \* \* \* \*

Q Let me direct your attention now to December 16th of 1980, did FBI Agent William Keefe visit your office on that day?
A Yes, he did.
Q And did he show you a bank surveillance photo at that time?
A Yes, he did.

\* \* \* \* \* \*

Q At the time that he showed you that photograph, did you recognize the individual in that photograph?
A Yes, I did.
Q And who was that individual?
A All I know him by was the name Tiny and he was a friend of our night manager.
Q Did you later learn that Tiny was Marshall Jackson?

A Yes.
Q How did you know Tiny?
A He attended a Christmas party at our store one night.
Q And when was that Christmas party?
A ... December the 29th, 1979.
Q The person you have identified, do you see him in the courtroom today?

\* \* \* \* \* \*

THE COURT: The record will reflect that the witness has identified the defendant.

\* \* \* \* \* \*

CROSS EXAMINATION:
Q Mrs. Heneghan, prior to having been shown that photograph marked Exhibit 11, how many times had you seen the individual named Tiny?
A I had only seen him once.
Transcript pp. 94–96.

F.2d 1092 (10th Cir.), *cert. denied*, 442 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 222 (1980); *United States v. Butcher*, 557 F.2d 666 (9th Cir. 1977).

■■■ Opinion testimony by a lay witness may be admitted under Rule 701 whenever the witness cannot adequately communicate to the jury the facts upon which his or her opinion is based. *United States v. Skeet*, 665 F.2d 983, 985 (9th Cir. 1982). The theory behind Rule 701 "is that *wherever inference and conclusions can be drawn by the jury as well as by the witness*, the witness is superfluous; . . . a lay opinion is received because and whenever his facts cannot be so told as to make the jury as able as he to draw the inference." 7 *Wigmore on Evidence* (Chadbourn rev. 1978) § 1917.8 at 10 (emphasis in original). Thus, in order to conclude that such testimony is admissible, the court must find that the witness' testimony is based upon his or her personal observation and recollection of concrete facts, *United States v. Skeet, supra* at 985, and that those facts cannot be described in sufficient detail to adequately convey to the jury the substance of the testimony. The Advisory Committee Notes to Rule 701 indicate that direct and cross-examination of the lay witness testifying as to his or her opinion is relied upon to verify the accuracy of the testimony.[2]

The defendant urges that Ms. Heneghan was not sufficiently familiar with him to meet the first part of the test for admissibility under Rule 701 and that the government failed to introduce other evidence showing that there was any need for such testimony and thereby failed to meet the second part of Rule 701's test. He also contends that his right to a jury trial was abrogated because Ms. Heneghan was permitted to testify as to the ultimate issue before the jury: whether the defendant was one of the bank robbers.

The defendant's initial attack on the admission of Ms. Heneghan's testimony is founded upon his belief that the witness' opinion was not "rationally based" upon her perceptions. He urges us to distinguish the instant case from others involving very similar factual settings where opinion testimony, as to the identity of the defendant as the person who committed the bank robbery, by lay witnesses was admitted, *United States v. Saniti*, 604 F.2d 603 (9th Cir.), *cert. denied*, 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 384 (1979); *United States v. Young Buffalo*, 591 F.2d 506 (9th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979); *United States v. Borrelli*, 621 F.2d 1092 (10th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 222 (1980); *United States v. Ingram*, 600 F.2d 260 (10th Cir. 1979), on the grounds that the witnesses in those cases were much more familiar with the respective defendants than is Ms. Heneghan with this defendant. It is true that in most instances where opinion testimony on the issue of identification is admitted the witness was intimately familiar with the defendant's physical appearance. In *United States v. Saniti, supra* at 605, the witnesses were the defendant's roommates and identified the clothing of the robber, as depicted in the bank surveillance photograph, as belonging to the defendant. The witness in *United States v. Borrelli, supra*, was the defendant's stepfather with whom the defendant had resided until just a few days before the robbery. In *United States v. Ingram, supra* at 262, the witnesses were acquaintances of the defendant in whose home he was staying at the time of the robbery. And in *United States v. Young Buffalo, supra*, the defendant's wife and parole officer were permitted to testify as to the resemblance of the defendant to the robber photographed by the bank surveillance cameras.

2.  The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than the broad assertion, and a lawyer can be expected to display his witness to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness.
    Notes of Advisory Committee on Proposed Rules, Rule 701.

At the opposite end of the spectrum from those cases in which the lay witnesses were closely aware of the defendants' appearance at the time of the crime stands *United States v. Butcher*, 557 F.2d 666 (9th Cir. 1977), in which the court affirmed the lower court's action in permitting two law enforcement officials who were acquainted with the defendant as well as the defendant's parole officer to testify that in their opinions the defendant was the person pictured in the bank surveillance photograph of the bank robbery. The court noted that the witnesses' opinions were based upon various contacts with the defendant occurring over a period of time; each witness, however, had spent only two to three hours with the defendant in total. In addition, contact between the defendant and the witnesses had ceased four months before the robbery. *Id.* at 667. Even in view of this limited exposure to the defendant, the court had no trouble concluding that the witnesses' opinions were "rationally based on prior contacts and conversations with the defendant." *Id.* at 669.

While we recognize that there is a difference between identification testimony which is based upon a witness' one social encounter with the defendant and identification testimony which is based upon a witness' close and on-going relationship with the defendant, we do not believe that the difference, in this case, is determinative of the issue of admissibility of the evidence. The amount of time that the witness had to observe the defendant goes to the weight to be accorded to the testimony by the jury rather than to its admissibility. *United States v. Lawson*, 653 F.2d 299, 303 n.15 (7th Cir. 1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982). The

defendant's counsel was given ample opportunity to bring out Ms. Heneghan's limited exposure to the defendant on cross-examination; after that, it was up to the jury to decide whether to believe Ms. Heneghan and, if believed, how much weight to place upon her opinion.[3] We agree with the district court that Ms. Heneghan's knowledge of the defendant was sufficient to come within the bounds of Rule 701(a).

The defendant's second contention is that the testimony of Ms. Heneghan was not useful to the jury. He argues that because the government failed to present any evidence that the defendant's appearance changed between April 30, 1980, the date of the robbery, and the time of the trial, the jury was in as good a position as anyone to assess whether the defendant was the same individual pictured in the surveillance photographs. We do not think that the absence of independent evidence as to a change in the defendant's appearance is fatal under the circumstances of this case. Ms. Heneghan testified that she was shown a photograph of the bank robber and that she identified the man in the photograph as Tiny. She also identified, in court, the defendant as Tiny. This testimony was useful to the jury even without evidence of a change in the defendant's appearance because it is based upon Ms. Heneghan's opportunity to compare the person in the bank surveillance photograph with every person she had ever met, whereas the jury could only compare the person in the surveillance photographs to the defendant.

We also note that there was evidence of a change in the defendant's appearance between the date of his arrest and the date of the line-up. It was apparent to the jury from the photograph taken on the date of

---

**3.** In considering whether certain opinion evidence by a lay witness was admissible to show the mental state of the defendant, this court in *United States v. Lawson*, 653 F.2d 299, 303 (7th Cir. 1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982) stated: "The [federal] rules [of evidence] permit the introduction of substantially more evidence than was formerly admissible. They place great reliance on cross-examination, for much evidence is now admissible subject to cross-examination

as a means of verification. It is then up to the fact finder to determine the weight to be attached to the evidence." *Compare United States v. Calhoun*, 544 F.2d 291 (6th Cir. 1976) (where the court excluded the identification testimony of the defendant's parole officer because the scope of cross-examination was restricted by virtue of the defendant's desire not to disclose to the jury the fact that the lay witness was the defendant's parole officer).

defendant's arrest compared to the photographs of the subsequent line-up that the defendant did, in fact, alter his appearance somewhat, by cutting his hair and shaving his mustache, during the brief period of just over one month. Moreover, the jury could compare the defendant's appearance *at trial* to his appearance in the January and February photographs in order to discern whether or not the defendant had attempted to alter his appearance even further. While we agree with the defendant that Ms. Heneghan's opinion would have been a *necessary* aid to the jury if there had been independent testimony that the defendant had altered his appearance between the time of the robbery and the date of the trial, we cannot conclude that the testimony of Ms. Heneghan was not "*helpful* to a clear understanding of . . . the determination of a fact in issue." Rule 701(b) (emphasis added).[4]

■ Finally, we reject the defendant's contention that the district court, by permitting Ms. Heneghan to testify as to the identification issue, allowed the function of the jury to be usurped. The jury was free to believe or disregard Ms. Heneghan's testimony; the issue of whether the defendant was the same person as the bank robber was left to the jury for its ultimate determination.[5]

For the foregoing reasons, we conclude that the district court did not abuse its discretion by admitting the opinion testimony of Ms. Heneghan. Moreover, even if we would have found that the testimony was not properly admitted under Rule 701, such a finding would not necessarily require reversal in this case. The jury was presented with other evidence, such as the testimony of Ms. Koch and the photographs of the robbery, from which it could have reasonably concluded that the defendant had participated in the bank robbery.

The judgment appealed from is therefore affirmed.[6]

AFFIRMED.

SHADUR, District Judge, dissenting.

Marshall Jackson ("Jackson") was the only person charged and tried for alleged participation in a three-man daylight armed robbery of the Broadway Bank. Of the three eyewitnesses who testified, only one

---

**4.** The Advisory Committee Notes to Rule 701 provide that "necessity as a standard for permitting opinions and conclusions has proved too elusive and too unadaptable to particular situations for purposes of satisfactory judicial administration," thereby rejecting the defendant's contention that necessity is the applicable standard in the instant case.

**5.** One commentator notes that "the witness, in expressing his opinion, is not attempting to 'usurp' the jury's function; nor could if he desired. He *is not* attempting it, because his error (if it were one) consists merely in offering to the jury a piece of testimony which ought not to go there; and he *could not* usurp it if he would, because the jury may still reject his opinion and accept some other view, and no legal power, not even the judge's order, can compel them to accept the witness' opinion against their own." 7 *Wigmore on Evidence* (Chadbourn rev. 1978) § 1920 at 19 (emphasis in original) (footnote omitted).

**6.** The dissent suggests that we have created a substantive conflict with decisions of other circuits. In our view the decisions in *United States v. Calhoun*, 544 F.2d 291 (6th Cir. 1976) and *United States v. Robinson*, 544 F.2d 110 (2d Cir. 1976), relied on in the dissent, announce no definitive principle in conflict with our decision here.

The *Calhoun* court opines that the testimony before it "teases the outer limits of Rule 701," that "it is not at all clear" whether the testimony was helpful in determination of a fact in issue, and "question[s]" whether the testimony amounted to merely choosing up sides. In short, the opinion expresses uncertainty on the issues before us. 544 F.2d at 295. We note our interpretation of the *Calhoun* holding is shared by the Ninth Circuit in *United States v. Butcher*, 557 F.2d 666, 670 (9th Cir. 1977) and the Tenth Circuit in *United States v. Ingram*, 600 F.2d 260, 262 (10th Cir. 1979).

The *Robinson* court expressed an inclination to agree that it is not improper to exclude testimony of a lay opinion whether the individual in a bank photograph is the defendant. The court went on to say that this is an "abstract proposition" inapplicable to the facts before the court. 544 F.2d at 113 n.4.

We note also that although the trial judge did initially have a mistaken impression of the nature of the Heneghan testimony, as reflected in the quotations in the dissent, fn. 7, the prosecution corrected the impression before the judge made his final ruling.

(teller Alice Koch) positively identified Jackson, and there were serious doubts as to other aspects of her identification efforts (one other person identified by her in a photo spread, and one other person in the lineup she said looked like the leader of the robbers, were wholly unrelated to the incident—in fact, the other person she referred to in the lineup was actually a Chicago police sergeant, Tr. 114, 142).

Neither of the other two testifying eyewitnesses positively identified Jackson.[1] Indeed the other teller, shown pictures of the lineup, was also unable to identify him.[2]

Only one witness was called by the defense, FBI agent William Keefe. His testimony was directed to the identification deficiencies just referred to[3] and to the fact the fingerprints lifted from the counter at the teller's window were definitely not Jackson's (Tr. 146–47).

All this is not of course to retry the case, but rather to indicate that the disputed identification testimony of Louise Heneghan was an important element of proof. We do not deal here with a clear situation of potential harmless error, though that is the impression the majority opinion would give.

Against that backdrop the Heneghan identification bulks large. And the majority opinion is, I submit, seriously flawed in its treatment of the evidentiary problem posed by the Heneghan testimony. Equally important, the opinion does not reflect that it conflicts with the views of other circuits and, I suggest, takes a position less attuned to the realities than those other opinions.

We do not confront on this appeal the usual problems of eyewitness identification. Instead the issue is posed by surveillance photos of the robbery itself—photos that went to the jury for *its* determination as the finder of fact. Our question is thus whether someone else, a non-eyewitness, should have been permitted to opine on the very question that was at the heart of the jury determination: Was the person depicted in the photo Jackson?

What circumstances can justify that kind of lay opinion evidence? Reason teaches that there must also be sufficient other evidence to support the conclusion that the lay non-eyewitness is *better* able to identify the defendant than the jury. Were the rule otherwise there would be no logical basis to exclude a parade of people, having more or less acquaintance with the defendant, from coming to the stand and swearing that the photo did or did not resemble the defendant. That would restore a procedure akin to the medieval concept of trial by wager of law, wholly at odds with our modern notions of trial.[4] It is in that sense that Rule 701 must be read in relation to this problem:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

1. Moreover, of the six eyewitnesses to the robbery who viewed the lineup, *only* Ms. Koch identified Jackson (Tr. 102). One other, Ms. Liberman, said Jackson's eyes "resembled" those of the robber, but that statement was more than balanced by her specifying several substantial differences in appearance (Tr. 80–81, 141).

2. Teller Curtis Brown, from whom the robber also took money, was shown frontal and profile pictures of the FBI-conducted lineup and did not identify Jackson as a participant in the robbery (Tr. 132).

3. Among other things, Agent Keefe's testimony reflected that a number of eyewitnesses had said they would be able to identify the robbers if given the opportunity (Tr. 138, 139, 140). As reflected at nn. 1 and 2, none was able to identify Jackson.

4. This very point was made as to Fed.R.Evid. ("Rule") 701 by the Advisory Committee on Proposed Rules, immediately after the partial quotation repeated at n. 5 of the majority opinion:

   > If, despite these considerations, attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule.

True enough, one possible predicate that has been a condition precedent to other courts' admissibility of such lay opinions did exist here. It was apparent to the jury that the physical appearance of the person in the surveillance photos differed from that of Jackson at trial, 11 months later. Under such circumstances testimony of a witness well acquainted with the defendant *at the time of the crime*, linking defendant's appearance at that time to the surveillance photo, obviously meets the Rule 701 requirement. It does something the jury cannot do equally well for itself.[5]

But that key connection is missing in this case. Ms. Heneghan had seen Jackson only once, and that over four months before the robbery (just under a year before she was shown the photo). For aught that appeared in the record Jackson did not have the same kind of facial hair as the robber, nor was he as bulky, in December 1979, when Ms. Heneghan saw him, any more than he did or was at trial in March 1981, when the jury saw him.[6] It is not enough to assert, from the mere fact of Ms. Heneghan's identification and without any testimony at all (by Ms. Heneghan or anyone else), the inference that Jackson did look the same on the one occasion Ms. Heneghan had seen him.

It may perhaps be argued that my position puts too high a premium on the prosecutor's failure to ask the questions that *might* have provided the missing link and obviated the problem.[7] From a different perspective, however, the majority's analysis permits a six-year prison term to rest on surmise—a result at odds with the fundamental right of a defendant to require proof of guilt beyond a reasonable doubt.

Lest it be thought that this opinion reflects a solitary view, it coincides—as the majority view does not—with that of the Sixth Circuit in *United States v. Calhoun*, 544 F.2d 291 (6th Cir. 1976). There the court reversed a conviction of an alleged bank robber whose parole officer had identified a surveillance photograph, testifying he had seen and talked with defendant about nine or ten times in the three months

---

**5.** That is precisely the rationale of all but one of the cases relied on by the majority opinion: *Saniti*, 604 F.2d at 605 (witnesses able to identify clothing on the person in the photograph—clothing unavailable to the jury for its comparison—as belonging to defendant); *Young Buffalo*, 591 F.2d at 513 (same); *Borrelli* (stepfather with whom defendant lived for five years, moving only a few days before robbery, held "in a much better position than the jury to give an opinion" because of defendant's significantly altered appearance between time of robbery and trial); *Ingram*, 600 F.2d at 601-02 (same, as to testimony by close acquaintances of defendant whose appearance had changed between time of robbery and trial). Only *Butcher*, 557 F.2d at 669-70, truly supports the majority opinion's approach—and even there the same court's later opinion in *Young Buffalo* stressed the aspect of *Butcher* holding "that the use of such testimony is not encouraged because the balance does not weigh heavily in favor of probative value over prejudicial effect." Thus the majority opinion's "supporting" authorities are weak reeds (or no reeds) on which to lean.

**6.** As the majority opinion states, Jackson's appearance differed substantially at the time of arrest (in January 1981) from the way he looked at the time of the lineup (in February 1981)—and both appearances differed from the depiction in the surveillance photos. Yet the majority opinion is willing to indulge the presumption, without any record support on the issue, that Jackson's appearance in Christmas 1979 was the same as at the time of the robbery, four months later. It contrasts that four-month lapse with the eleven-month lapse between the robbery and trial. But the vital factor is not the mere passage of time but what happened to Jackson's appearance during the time interval, and the only relevant evidence (as distinct from speculation) on that score is that *one* month (January to February 1981) had been enough for a meaningful change.

**7.** It is not as though the prosecutor were unaware of the issue. When Jackson filed a pretrial motion to suppress, the trial judge asked specifically "you are going to put on somebody who knew Tiny in April of 1980 [the time of the robbery]?" (Tr. 22). When the prosecutor responded "Right," the trial judge ruled he would "certainly allow . . . testimony that in April of 1980 that the defendant had facial hair, if that were the case, you know" (Tr. 23). That initial ruling by the trial court focused on the proper predicate for any opinion evidence as to the surveillance photo. After the prosecutor did not deliver as originally advertised—by using a casual meeting in December 1979 rather than acquaintance at the vital April 1980 date—he cannot fairly shift the consequences of his flawed prosecution onto the defendant.

preceding the robbery, most recently just three days before. One of the two alternative grounds for decision was equally applicable here (*id.* at 295): [8]

> We think it is important to note here that it is not claimed that Snyder's opinion testimony was that of an expert and thus subject to the more specialized rules concerning expert opinion testimony embodied in Rule 702, Federal Rules of Evidence. Unlike [citing cases], it cannot be claimed that Snyder was possessed of any expertise superior to that of the jury. [citing cases] On the contrary, Snyder's testimony was offered solely as that of a lay witness whose close familiarity with Calhoun at the time of the robbery enabled him to make an ordinary identification of Calhoun, as he then appeared, from the surveillance photograph which had been offered and received in evidence. [citing case]

Rule 701 of the Federal Rules of Evidence governs opinion testimony by lay witnesses:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

In considering Snyder's testimony as a lay witness, we note that his testimony or indeed the testimony of anyone who might have known Calhoun at the time, teases the outer limits of Rule 701.[9] The bank surveillance photos themselves had already been received in evidence. The jury could see both the photographs and Mr. Calhoun.

An examination of the testimony given by Snyder shows that it meets the requirement of Rule 701(a) as being rationally based on the perception of the witness. However, whether this testimony was "helpful to the determination of a fact in issue" under Rule 701(b) is not at all clear. According to the testimony of Glenna Porter, at least, Calhoun's appearance at the time of trial was different from that on the day of the offense. Thus one intimately acquainted with Calhoun at the time of the robbery might conceivably be in a better position than the jury to recall his appearance then and compare it with a photograph. However, Snyder was in fact uncertain whether at the time of the robbery Calhoun had a mustache, goatee, or sideburns; the only certainty was that he had "facial hair" of some kind. We also question whether Snyder's testimony was merely an "attempt ... to introduce meaningless assertions which amount to little more than choosing up sides." Advisory Committee's Note on Rule 701.

Reversal here should follow *a fortiori* from the *Calhoun* rationale.

Similarly the analysis in *United States v. Robinson*, 544 F.2d 110 (3d Cir. 1976), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 901, 54 L.Ed.2d 803 (1978) supports this opinion and not the majority conclusion. There the court distinguished between the admissibility and non-admissibility of two kinds of lay opinion testimony as to bank surveillance photographs, and it based its distinction wholly on whether the "comparison that [the witness] was going to make was one which the jury could not have made for

---

**8.** It is true that *Calhoun* referred to the "main defect" in permitting the parole officer to testify stemmed from the parolee-parole officer relationship, *id.* at 295-96; see n. 3 of the majority opinion in this case. That however does not detract from the force of the analysis or of the court's statement on the issue discussed in the text of this opinion.

**9.** Note 6 of the majority opinion adverts to this language as evidence that *Calhoun* does not conflict with the majority decision here. But what "teased the outer limits" in *Calhoun* was

"testimony of anyone who might have known [the defendant] *at the time*" (emphasis added). Where as in this case the witness' only observation of the defendant had been a single instance substantially removed from the time of the robbery (and *not* one of "close familiarity ... at the time of the robbery"), and where there was no proof at all to connect the defendant's appearance at those two discrete times, *Calhoun* plainly would view the witness' testimony as *outside* "the outer limits of Rule 701."

itself, so his testimony did not suffer from a 'lack of helpfulness' " (*id.* at 113). In fact, as indicated at n.5, the same concept underpins all but one of the authorities on which the majority opinion relies.

Five things, then, are troublesome in the majority opinion:

(1) Its proposition that Ms. Heneghan's "original identification of the man shown in the photograph reflected a comparison of that person's features with the appearance of every person she had ever met" proves too much. Consider for a moment the application of that notion, as the majority would, to the situation in which the appearance of the defendant when the witness saw him is no different from his appearance at the time of trial.[10] When the jury views the defendant over the course of the trial and then views the man shown in the photograph, each juror too makes the same "comparison of that person's features with the appearance of every person [he or] she had ever met." That same comparison based on universal experience enables each juror to exercise his or her judgment whether or not the person in the photograph and the defendant are one and the same—that is after all what identification is all about. And it should be remembered that the witness has compared the photo with stale recollection, based on a single short meeting a year earlier, while the jurors' comparison of the photo is with a current in-the-flesh viewing over the entire period of the trial. Thus all the witness can provide is something the jury can do *far better* for itself.

(2) As already indicated, applied literally it would permit an endless parade to the witness stand, a kind of impermissible plebiscite. All of us know the perils of imperfect identification, and such an approach would compound the risk.

(3) It misses entirely the significance of changes in appearance. In that respect the critical comparison is not, as the majority opinion would have it, between the time of arrest and the time of the *lineup.* Rather there are two important comparisons:

(a) Difference in appearance between the time of the *photo* and the time of *trial* is an essential prerequisite to any introduction of lay opinion testimony (unless of course the witness can testify about something in the surveillance photo other than the defendant himself, such as his clothing, as in *Saniti* and *Young Buffalo*—and in that event the significant identification is after all of something other than the person).

(b) Once the initial requirement is met, similarity of appearance between the time of the *witness' acquaintance* and the time of the *photo* is equally essential, else the evidence has not satisfied the need to demonstrate that the witness had a better opportunity for judgment than the jury. This is the critical gap in our case.

(4) It treats as similar to this case a group of decisions all but one of which meet the standards of this opinion, as Jackson's case does not.

(5) It seeks to distinguish the contrary authority (*Calhoun* and *Robinson*), but I believe a full reading of those opinions reflects a substantive and material conflict with the approach and result of the majority opinion. All of us of course recognize the significance of conflict among circuits (including the potential for certiorari).

\*  \*  \*  \*  \*  \*

For all these reasons I respectfully dissent.

---

**10.** As already stated, on the record before us there is nothing to indicate that was not in fact the case here.