In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1764

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TREMAINE WHITE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 08 CR 50058—**Frederick J. Kapala**, *Judge.*

ARGUED DECEMBER 2, 2010—DECIDED APRIL 6, 2011

Before EASTERBROOK, *Chief Judge*, and MANION and
WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Tremaine White was convicted
of bank robbery and sentenced to 137 months' imprison-
ment. White appeals, challenging the district court's
admission of testimony from his sister and ex-girlfriend
that he is the individual in a still photograph taken
from the surveillance video of the bank robbery. He
also challenges the district court's admission of a hand-

written demand note recovered from his rental car, and the district court's reliance on that note to enhance his sentence for having made a threat of death during the robbery. We affirm.

I.

On December 26, 2008, an individual, later identified as Tremaine White, entered a US Bank branch in Rockford, Illinois and approached the sole bank teller on duty. After asking the teller some questions, White slid a note across the counter demanding all of the money in her drawer and instructing her not to include any dye packs. The note also stated that White had a weapon, although the teller does not remember the exact wording of the note. When White slid the note across the counter, he placed his hand inside the waistband of his pants, as if he were grabbing a gun. The teller followed White's directions and gave him all of the money in the drawer, totaling $18,582.

After White left the bank, the teller activated the bank alarm. Police responded immediately. The teller explained in detail how the robbery had occurred and provided the officers with a description of the robber—6'-6'2, black male, with small eyes, and approximately 215 pounds. The teller also described the demand note, telling the police that it was written on lined paper, with a frayed edge as if torn from a spiral notebook; she also told the officers what, to the best of her recollection, it said.

Meanwhile, White took the robbery proceeds back to the house he shared with his uncle, William Cole ("Uncle Bill"), and his mother. His sister, Shenay White, was also at the house and saw White holding a bag containing a large amount of money in wrappers that appeared to have come from a bank. The next day White gave Shenay a little over $3,000 to bond his girlfriend, Kristina Saylor, out of jail—the apparent motive for the crime. White then placed the rest of the money in a plastic bag in his closet where Shenay later discovered it. Shenay helped herself to about $1,200 and then told Uncle Bill about the money, who also took some of the money. When White discovered the loss, he confronted Shenay and angrily accused her of stealing his money. She returned the money, but White allowed her to keep $400.

Shenay was either upset that White wouldn't share more of the robbery proceeds, or feared she would be blamed for being in on the bank robbery since she had used the money to bail out Saylor. Whatever the motivation, a few days after the robbery Shenay went to the police and told them that she suspected her brother of robbing the US Bank. Investigators showed Shenay a still photograph from the bank surveillance video and she identified White as the robber. They also showed the still photograph to Saylor and she too identified White as the individual in the photograph. Officers then created a photo-array with White and several other similar-looking individuals and showed it to the teller. The teller immediately identified White as the robber.

On December 29, 2008, after the teller identified White, the police arrested him at his home. They searched the house, but did not find the money. The officers did, however, seize a coat and boots that the teller later identified as similar to those worn by the robber. After the police left, Shenay and Uncle Bill searched the house for the money and found it hidden in the basement in an electrical compartment of the washing machine. There was still about $12,000 left, which they divided between themselves before spending it on various items; they were later charged with possessing bank robbery proceeds. Police conducted a second search the next day—too late to find the money—but they did find jeans and a stocking cap which matched those worn by the robber, as described by the teller and shown in the surveillance video.

Police also searched White's rental car, which police had impounded at the time of his arrest, and recovered a robbery demand note. It was written on a piece of lined notebook paper with a frayed edge, matching the description of the note the bank teller had given. The officers also recovered a notebook from which the demand note had apparently been torn. The note read:

> I have a gun. Give me the money in the register. No dye packs, no silent alarms, and no one will get hurt. Do it quickly.

Before trial, police showed the note to the teller, but she said that she did not think it looked like the note used in the robbery.

Based on the above evidence, a grand jury indicted White on one count of bank robbery in violation of 18

U.S.C. § 2113(a). White pleaded not guilty and pro-
ceeded to trial. After his arrest, but before trial, White
continued to speak with Saylor and during one of
those conversations he told Saylor to tell the police that
he did not commit the robbery and that he was not the
man in the surveillance photograph.

At trial, the above evidence was presented. Addi-
tionally, Shenay and Saylor (now an ex-girlfriend)
testified that the man shown in a still photograph
from the surveillance video was White. The teller also
testified, describing the robbery and the robber in
detail, and she again identified White as the robber. The
government also presented the recovered demand note,
but the teller could not say whether it was the one used
during the robbery. White, for his part, presented as his
theory of defense that he was not the robber—but that
it was Uncle Bill.

The jury apparently rejected White's theory of the
case and convicted him of bank robbery. The district
court then sentenced him to 137 months' imprisonment.
In calculating White's guideline range, the district court
found that the note recovered from the rental car was
the note used during the bank robbery. And because
that note had stated that White had a gun, the
district court enhanced White's guideline range under
§ 2B3.1(b)(2)(F) for having made a threat of death
during the robbery. White appeals.

## II.

On appeal, White claims the district court erred in admitting testimony from his sister and ex-girlfriend that he is the individual shown in the still photograph from the surveillance video taken during the bank robbery. White also challenges the district court's admission of the handwritten demand note recovered from his rental car. Finally, White challenges his sentence, arguing the district court erred in relying on the demand note to enhance his sentence for having made a threat of death during the robbery. We consider each issue in turn.

### A. *Identification*

As noted above, at White's trial both his sister, Shenay, and his ex-girlfriend, Saylor, testified that the man shown in the still photograph from the surveillance tape of the bank robbery was White. White did not object to Shenay's testimony but did object to Saylor's, so the standard of review is plain error and abuse of discretion respectively. *United States v. Towns*, 913 F.2d 434, 445-46 (7th Cir. 1990).

The identifications of White by Shenay and Saylor from the still photograph are considered lay opinion evidence and their admissibility is governed by Federal Rule of Evidence 701. Under Rule 701, a lay witness's opinion is admissible if it is: "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of the fact in issue." Fed. R. Evid. 701. Here, Shenay and

Saylor's testimony met the requirements of Rule 701 and was properly admitted. Both witnesses—one his sister, the other his ex-girlfriend—were very familiar with White, and thus their opinion was "rationally based" on their perceptions. Additionally, their testimony satisfies the second prong of Rule 701 because it helped determine a fact in issue, i.e., the identity of the bank robber.

In response, White argues that allowing a lay witness to identify him as the culprit invades the province of the jury. We have already rejected this argument in *United States v. Jackson*, 688 F.2d 1121 (7th Cir. 1982). In *Jackson*, the district court allowed a witness who had met the defendant on only one occasion to offer lay opinion testimony that he was the individual shown in a surveillance video robbing a bank. Among other things, the defendant argued that permitting such lay opinion testimony usurped the jury's function. We rejected that argument, explaining: "The jury was free to believe or disregard [the witness's] testimony; the issue of whether the defendant was the same person as the bank robber was left to the jury for its ultimate determination." *Id.* at 1126 Similarly, in this case the jury was free to disregard Shenay and Saylor's testimony that the individual depicted in the still photo from the surveillance video was White. *See also United States v. Towns*, 913 F.2d 434 (7th Cir. 1990) (holding the district court did not err in admitting lay opinion testimony from the defendant's ex-girlfriend that the defendant was one of the robbers in a bank surveillance photograph); *United States v. Stormer*, 938 F.2d 759, 762 (7th Cir. 1991) (holding the district court did not err in

admitting lay opinion testimony that defendant was the individual depicted in a bank surveillance photograph).

White also argues that lay opinion evidence on the identity of an individual shown in a surveillance photograph is only permitted if the defendant's appearance had changed since the crime or if the accused had attempted to disguise himself. While both circumstances would justify the admission of lay opinion testimony, *Jackson*, 688 F.2d at 1125, *Towns*, 913 F.2d at 445, *Stormer*, 938 F.2d at 762, neither is required. Rather, as we explained in *Towns*, "[g]enerally, a lay witness may testify regarding the identity of a person depicted in a surveillance photograph 'if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.'" *Towns*, 913 F.2d at 445. This case presents just such a circumstance. While White did not wear a disguise, the view of his appearance in the surveillance video and in still shots was limited by his attire—he wore a bulky winter coat closed up to his chin and a hat pulled down to his eyebrows. The surveillance video was also not of the best quality. In fact, at trial, White's attorney claimed that even if the jury watched "that video a hundred times," they would not "get a good enough look at the person involved to determine who is the bank robber." He later added: "No reasonable human being can make out in that photograph sufficient features to determine who is depicted there." Also, as noted above, White's theory of defense was that the man depicted in the still photographs was really Uncle Bill, and White's attorney argued that the robber's hat prevented the

jury from determining whether the man robbing the bank had grey hair (like Uncle Bill), or black hair, like White. Finally, while cross-examining the teller, White's attorney argued that because White and his uncle were relatives, the teller could easily have mistaken White for his uncle. Because both Shenay and Saylor knew White and Uncle Bill, they were able to provide the jury with helpful insight regarding the true identity of the man shown in the surveillance video and counter White's claim that the still photograph really de-picted Uncle Bill. In fact, in questioning Saylor after she identified White as the individual shown in the photograph, the government asked: "And you made that identification having seen both Tremaine White and knowing the appearance of William Cole, correct?" Saylor responded "yes." All of these circumstances make Shenay and Saylor's lay opinion testimony helpful to the jury and thus admissible under Rule 701.

### B. *Demand Note*

White next challenges the district court's decision to admit the demand note recovered in his rental vehicle, claiming that the note was not properly authenticated, that it was inadmissible hearsay, and that any probative value was outweighed by unfair prejudice. At trial, White objected to the admission of the demand note, but solely because the bank teller had told authorities that she didn't think the note recovered looked like the one used in the robbery. While in making this objection White did not use the buzz word "authentication," the

objection was sufficient to preserve the issue. Thus, we review the question of authentication for an abuse of discretion. *United States v. Whitaker*, 127 F.3d 595, 600-01 (7th Cir. 1997). However, before the district court, White did not raise a hearsay or unfair prejudice objection to the admission of the demand note. Therefore, our review of those two challenges is for plain error. *Prymer v. Ogden*, 29 F.3d 1208, 1213-14 (7th Cir. 1994) (holding that "[a] specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal") (internal quotation omitted).

We first consider White's authentication objection. Federal Rule of Evidence 901(a) requires, as a condition precedent to admissibility, "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). In this case, at trial the government presented the demand note as a note recovered from White's rental vehicle. And the government presented evidence, in the form of testimony from the officer who recovered the note, establishing that that was exactly what the note was. Thus, the government properly authenticated the note.

White responds that even if the police found the note in White's rented car, the government did not properly authenticate the note as the one actually used in the bank robbery. But at trial the government never claimed that the demand note recovered from White's rental car was the same one used during the robbery. In fact, during closing argument, the prosecutor instead suggested that it may "have been a practice note," or it

could have "been intended to be the note that was used and then misplaced so [White] had to make up another note." The district court likewise did not admit the note on the premise that it was the one used during the robbery, stating instead "whether it's the same note that he actually presented to her isn't determinative of its admissibility." Because the demand note was admitted at trial solely as a note recovered from White's car, there was no need for the government to further establish that the note was the one used during the robbery for it to be authenticated.[1]

Additionally, White claims on appeal that the demand note was inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is inadmissible unless an exception applies. Fed. R. Evid. 802. In this case the demand note was not hearsay because it was not offered to prove the truth of the matter asserted. *United States v. Bursey*, 85 F.3d 293, 296 (7th Cir. 1996) ("[S]tatements that are offered not to prove 'the truth of the matter asserted,' but for some other legitimate purpose, do not qualify as hearsay."). First, a command is not hearsay because it is not an assertion

---

[1] On appeal, the government claims the demand note was authenticated by circumstantial evidence as the note used during the bank robbery, *see, e.g., United States v. DeGudino*, 722 F.2d 1351, 1361 (7th Cir. 1983), but since the note was not admitted for that purpose at trial, we need not decide whether it was authenticated as such.

of fact. *See United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999) (explaining that "the out-of-court statements in question were simply directions (e.g., to make false statements in the warrant applications) and not statements of fact at all," and therefore the "evidence in question was not hearsay at all"). Thus, the note's directive to "[g]ive me the money in the register. No dye packs, no silent alarms," is not hearsay. The only possible factual assertions in the note were "I have a gun" and "and no one will get hurt." But the demand note was not admitted to prove the truth of either assertion. The government did not seek to prove that White actually had a gun, but rather that the teller feared that he did; nor did it seek to establish that no one would get hurt if the teller complied with the robber's demands. White responds that the district court should have provided the jury with a limiting instruction regarding the proper use of the note. White, however, did not request a limiting instruction and given that the government never argued that the note was the one used in the robbery or that White was actually armed during the bank robbery, the district court did not commit plain error in failing to *sua sponte* issue a limiting instruction.

Next, White argues that any probative value of the demand note was outweighed by unfair prejudice, and thus the district court erred in admitting the note under Federal Rule of Evidence 403. Again, our review is for plain error only. In this case there was no error, much less plain error. The demand note recovered from the car was extremely probative on the question of whether White robbed the US Bank—it showed plan-

ning and preparation. White responds that the mention of a gun in the note made it unduly prejudicial. But the teller testified that the robber's note had stated he had a weapon and that at the same time that he slid her the note, he reached toward his waistband, as if reaching for a gun. That the note admitted at trial stated White had a gun as opposed to a weapon does not make the note unfairly prejudicial, and in any event, any unfair prejudice is outweighed by the probative value of the note. Accordingly, the district court did not err in admitting the demand note.

### C.  Sentencing

Finally, White challenges his sentence, claiming that the district court erred in assessing him a two-level guideline enhancement under § 2B3.1(b)(2)(F) for having made a threat of death during a robbery. In concluding that a § 2B3.1(b)(2)(F) enhancement was appropriate, the district court found, based on the preponderance of the evidence, that the demand note seized from White's rental car was the note used during the bank robbery. Because that note stated that White had a gun, the district court concluded that alone was sufficient to support the § 2B3.1(b)(2)(F) enhancement. But the district court also reasoned that White's movement with his hand to his waistband "would further cause a reasonable teller to believe that defendant had a gun and cause the teller fo fear death." The district court added that the teller's actions, manner, and demeanor in the video further caused the court to conclude that the note constituted a threat of death.

On appeal, White again contends that the demand note was not properly authenticated and thus could not be used to support the § 2B3.1(b)(2)(F) enhancement. But the Federal Rules of Evidence do not apply at sentencing hearings—the only question is whether the evidence was "reasonably reliable." *United States v. Morris,* 76 F.3d 171, 174 (7th Cir. 1996). Moreover, we review the district court's judgment only for clear error, *United States v. Johnson,* 324 F.3d 875, 877 (7th Cir. 2003), and the district court did not commit clear error in finding that the demand note recovered from White's car was the one used in the robbery. While the teller told police she didn't think it looked like the note White had given her, she had also told officers that she had only skimmed the note and, as the district court found, at the time of the robbery she was frightened. Given that the recovered demand note matched in all respects the one described by the teller (written on lined notebook paper with frayed edges and stating that the robber had a weapon, demanding money, but no dye packs) and was recovered from White's rental car, the district court could reasonably believe that it was used by the robber and the teller was mistaken. And because the district court did not clearly err in finding that White had presented the teller with a note which stated that he had a gun, the district court properly enhanced White's sentence under § 2B3.1(b)(2)(F). *United States v. Carbaugh*, 141 F.3d 791, 794 (7th Cir. 1998). That is especially true given that White also reached to his waistband as if he had a gun, and given the teller's fearful reaction captured on the surveillance video.

III.

The district court did not err in admitting testimony from White's sister and ex-girlfriend that he is the individual shown in a still photograph from the surveillance video from the bank. This testimony was permissible lay opinion evidence that helped the jury determine a question in fact, namely the identity of the bank robber, and was extremely helpful given White's argument that Uncle Bill was the real perpetrator. The district court also did not err in admitting the handwritten demand note recovered from White's rental car because it was properly authenticated, not hearsay, and its probative value outweighed any undue prejudice. And the district court did not err in relying on that note to enhance White's sentence for having made a threat of death during the robbery. We AFFIRM.