In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2098

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LESLIE WILLIAMS-OGLETREE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-CR-203 — **Amy J. St. Eve**, *Judge.*

ARGUED JANUARY 22, 2014 — DECIDED MAY 12, 2014

Before WOOD, *Chief Judge*, and MANION and WILLIAMS,
*Circuit Judges.*

MANION, *Circuit Judge*. Leslie Williams-Ogletree was
indicted in a six-count indictment related to a scheme to file
false tax returns. Count one charged Williams-Ogletree with
conspiracy to defraud the United States government and the
remaining counts charged her with five specific incidents of
presenting false, fictitious, or fraudulent claims to the United
States Department of Treasury. She pleaded not guilty, but,

following trial, a jury convicted her on all counts. The district court sentenced her to 51 months' imprisonment. Williams-Ogletree appeals her sentence, arguing the district court erred in calculating the loss involved and in assessing the § 3553 sentencing factors. We affirm.

**I.**

In 2005, Leslie Williams-Ogletree ("Ogletree") ran Chicago-based LKJ Tax Services, a tax preparation service. Ogletree applied for and obtained an Electronic Filers Identification Number ("EFIN") from the IRS, which allowed her to file tax returns electronically in other people's names and to obtain electronic refunds. In late 2005, Ogletree conspired with Robtrel White and Larryl White to submit false income tax returns to the IRS. Robtrel and Larryl would obtain and provide Ogletree with various birth dates and social security numbers for individuals unlikely to file income tax returns, and then Ogletree would file the false returns with LKJ's EFIN, using that personal information. The co-conspirators also generated false W-2 wage and tax statement data to support the false refund claims.

Between February and October 2006, Ogletree used LKJ's EFIN to file 200 fraudulent income tax returns for the tax year 2005 in the names of individuals supplied by Robtrel, Larryl, and others. These tax returns sought refunds in the amount of $834,548 and the actual tax loss to the IRS was $652,730. The proceeds from the fraudulent tax returns were obtained in the form of a tax refund anticipation loan ("RAL") check which Ogletree printed at LKJ's offices, pursuant to an agreement with Bank One. Robtrel then deposited many of these checks

into his own bank accounts. Ogletree also received direct payment from Bank One of a portion of the refund, which represented her purported tax preparation fee. In total, she received $62,203 in tax preparation fees for the 200 fraudulent returns. A review of Ogletree's bank account also showed cash deposits in 2006 totaling approximately $28,000.

In 2007, Robtrel established a storefront business called "Tax Pro" in Chicago and obtained several additional EFINs for new tax preparation entities, including NP Financial Service and PJH Financial Service. According to Robtrel, Ogletree continued to participate in the conspiracy in early 2007, before she had a falling-out with her co-conspirators. (Ogletree claims she had withdrawn from the conspiracy and had not filed any fraudulent tax returns in 2007, or later years.) Robtrel and Larryl continued the fraudulent tax-filings scheme into 2008, before they were caught.

When the government eventually detected the scheme, it indicted Ogletree, Robtrel, and Larryl, charging them with conspiracy and filing false claims with the IRS. Specifically, the government charged Ogletree with one count of conspiracy to defraud the United States government, in violation of 18 U.S.C. § 286, and five counts of presenting a false, fictitious, or fraudulent claim upon and against the United States Department of Treasury, IRS, in violation of 18 U.S.C. §§ 287 and 2. Robtrel and Larryl pleaded guilty, but Ogletree pleaded not guilty and proceeded to trial.

At trial, the government presented testimony from numerous witnesses, including an IRS agent who testified that a review of tax returns filed in 2006 with the EFIN issued to

Ogletree's tax preparation business, LKJ, revealed that 200 returns were fraudulent. The jury also heard from five individuals in whose name Ogletree had filed tax returns. These individuals testified that they had not worked in 2006; did not live at the addresses listed on the tax returns; had not hired Ogletree to file tax returns on their behalf; had never met Ogletree; and had not received the tax refunds. Some of the individuals admitted to selling their personal information to Robtrel and/or Larryl, while others claimed that their personal information had been stolen. The government also presented testimony from a Bank One representative who explained the tax refund anticipatory loan process and the tax preparation fees deposited into Ogletree's account.

Ogletree did not call any witnesses. Instead, her attorney argued that the government did not establish that Ogletree had joined the conspiracy or knowingly filed false returns. Her attorney focused on the fact that the witnesses all pointed to Robtrel and Larryl and that no one had identified Ogletree as being involved. The jury rejected Ogletree's argument and found her guilty on all counts.

Sentencing followed. At the sentencing hearing, Ogletree strenuously challenged the government's position that she had continued to participate in the tax conspiracy in 2007. The district court, though, found the government had proven by a preponderance of the evidence that Ogletree had continued to file false tax returns and held her responsible for 68 fraudulent tax returns filed under PJH Financial's EFIN in 2007, with intended losses totaling $253,073. When taken in combination with the $834,548 of intended losses from the 200 fraudulent returns filed in 2006, the total intended loss involved exceeded

$1,000,000 and resulted in a base offense level of 22. Following other adjustments, not at issue on appeal, Ogletree's guideline range was 51–63 months' imprisonment. The parties then made extensive arguments on the § 3553 sentencing factors. Following argument, the district court sentenced Ogletree to 51 months' imprisonment.

Ogletree appeals only her sentence. She challenges first the district court's loss calculation, arguing that the evidence did not support the court's finding that she participated in the tax fraud scheme in 2007. Second, she argues that the district court did not adequately consider the § 3553 sentencing factors and that her 51-month sentence was substantively unreasonable.

## II.

### A. Loss Calculation

In sentencing Ogletree, the district court first considered her base offense level. The base offense level for her crimes of conviction depends on the attempted or intended tax loss. U.S.S.G. § 2T1.1(c)(1); *United States v. Chavin*, 316 F.3d 666, 677 (7th Cir. 2002). Pursuant to U.S.S.G. § 2T4.1, the base offense level for a tax loss greater than $400,000 is 20 and the base offense level for a tax loss greater than $1,000,000 (but less than $5,000,000) is 22. The district court concluded that the intended loss in Ogletree's case was between one and five million dollars, based on the intended loss of $834,548 related to the 200 false and fraudulent income tax returns submitted in 2006 via the LKJ Tax Services' EFIN, and the $253,073 in intended loss from the 68 fraudulent tax returns filed in 2007 under PJH Financial's EFIN.

Ogletree argues on appeal, as she did before the district court, that she did not file any tax returns under PJH Financial's EFIN and that the district court erred in including the $253,073 related to those returns in its loss calculation. This court reviews a district court's tax-loss determination for clear error. *United States v. Collins*, 685 F.3d 651, 659 (7th Cir. 2012). To show clear error, a defendant "must show that the district court's calculation was not only inaccurate but outside the realm of permissible computations." *United States v. Al-Shahin*, 474 F.3d 941, 590 (7th Cir. 2007).

Ogletree cannot clear this high hurdle. The evidence in this case was more than sufficient to support the district court's finding that Ogletree was responsible for filing the 68 fraudulent tax returns in 2007. First, the district court relied on co-conspirator Robtrel White's plea agreement. In his plea agreement, Robtrel stated that Ogletree continued to participate in the tax fraud conspiracy in early 2007, operating out of Robtrel's "Tax Pro" office, and filing fraudulent tax returns using PJH Financial's EFIN. The district court then relied on the fact that 68 returns filed using PJH Financial's EFIN, all on approximately January 4, 2007, used the same identifying information as fraudulent tax returns filed the previous year with Ogletree's LKJ Tax Services' EFIN. Finally, the district court noted that Ogletree's continued participation in the tax fraud scheme in early 2007 was confirmed by a tax log sheet recovered from Robtrel's home.

In response, Ogletree argues this evidence is not reliable and, as such, cannot support the district court's factual findings. First, she points out that Robtrel "had every reason to downplay his role in the conspiracy and to place blame on

Ogletree." But that does not make his statements unreliable. *See United States v. Johnson*, 489 F.3d 794, 797 (7th Cir. 2007) ("Accordingly, their status as self-interested co-conspirators does not thereby render the information inherently unreliable."). Rather, "[w]e have repeatedly held … that even the testimony of a potentially biased witness is sufficient to support a finding of fact." *Id.* In fact, the district court may credit testimony that is "totally uncorroborated and comes from an admitted liar, convicted felon, or large scale drug-dealing, paid government informant." *Id*. (internal quotation and citations omitted).

Further, the district court did not merely rely on Robtrel's statement; the court also relied on a tax log recovered from Robtrel's home during an unrelated search that took place during a response to a domestic disturbance. That tax log ran about ten pages and listed names, social security numbers, dates, and the names of "preparers," as well as the names of "runners," i.e., individuals who had obtained the taxpayer identification information. There were about a half-dozen different names or initials listed under the column for preparer, including "Leslie" and LKJ. The district court found that this document corroborated Robtrel's statement that Ogletree had continued in the conspiracy in early 2007 because the dates listed on the tax log bore dates in mid-January of 2007.

Ogletree argues the tax log is also unreliable. She points out that no one authenticated it and that it is unclear who prepared the document. That is true, but at sentencing the district court can rely on unauthenticated documents, as long as they bear an indicia of reliability. *United States v. White*, 639 F.3d 331, 338 (7th Cir. 2011). In this case, the fact that the tax logs were

recovered during a search of co-conspirator Robtrel's home provides them with the indicia of reliability.

Ogletree further attacks the reliability of the tax log by noting that it listed 2007 as the "Tax Year," but that the government relies on it to establish that she participated in the tax conspiracy for the 2006 Tax Year. But the dates listed were in early 2007 and this document was seized from Robtrel's home in mid-2007, so the district court could reasonably find that the "2007" written next to "Tax Year" meant the year the returns were submitted, especially since, unlike Ogletree, her co-conspirators were not trained tax preparers.

She also stresses that next to "Leslie" was written "male," and argues that this shows that she was not the male preparer named "Leslie." However, the government presents a more reasonable interpretation of the tax log gender-identifier: It is not the gender of the preparer, but of the taxpayer. This view is more consistent with the totality of the tax log because the gender next to the preparer did not always remain constant. For instance, preparer "low" had both "male" and "female" listed next to his moniker. Further, next to some of the "male"/"female" identifiers was the phrase "under 21." This additional identifier is more consistent with the government's view that the "male"/"female" identifier was related to the purported taxpayer and not the tax preparer. Thus, the listing of "male" next to Leslie's name does not render the tax log unreliable.

In sum, both Robtrel's plea agreement and the tax log support the district court's finding that Ogletree continued to file fraudulent tax returns in 2007. The district court further

found Ogletree responsible for filing 68 specific tax returns, based on the fact that those returns were filed on approximately January 4, 2007, using PJH Financial's EFIN and that those returns all bore the same identifying information (i.e., names, social security numbers, purported employers) as the fraudulent tax returns filed the previous year by Ogletree, under her LKJ Tax Services' EFIN.

In response, Ogletree argues that there was no reason for her to use PJH Financial's EFIN because she had her own LKJ Tax Service's EFIN. She asserts that if she filed under the PJH Financial's EFIN she would be depriving herself of her only remuneration for the offense—her tax preparer fees. But at trial, the government presented evidence that Ogletree made cash deposits of about $28,000 into her bank account in 2006 and this easily supports an inference that she received cash sums for her participation in the tax fraud scheme (and would continue to do so in 2007).

The PSR provides further support for the district court's finding that Ogletree was responsible for filing the 68 tax returns in early 2007. The PSR stated that according to Robtrel, Ogletree used PJH's EFIN "to file false tax returns for many of the same individuals whose false returns had been filed the previous year by LKJ." The PSR further explained that Ogletree left the conspiracy after an argument between her and Robtrel stemming from the "IRS flagging claims filed under PJH Financial's EFIN because they were using repeat information for claims previously filed under LKJ." A district court may rely on information contained in a PSR so long as it appears reliable. *United States v. Heckel*, 570 F.3d 791, 795 (7th Cir. 2009). Statements in a PSR based on co-conspirator's

statements clear that hurdle. A defendant may challenge the reliability or correctness of the facts in the report, but absent more than a "'bare denial' of the information" contained in the PSR, the government need not present further evidence confirming its reliability. *Id.* (quoting *United States v. Mustread*, 42 F.3d 1097, 1102 (7th Cir. 1994)). As just noted, Ogletree presents a bare denial to her continued participation in the scheme and that is not enough. Accordingly, the district court did not clearly err in finding her responsible for the filing, in early January of 2007, of 68 fraudulent tax returns with intended losses of $253,073 and in calculating her guideline range at 51–63 months' imprisonment.

### B. Substantive Reasonableness

After calculating Ogletree's guideline range at 51–63 months' imprisonment, the district court heard arguments on the appropriate sentence and the § 3553 sentencing factors. Following argument, the district court sentenced Ogletree to 51 months' imprisonment. Ogletree claims on appeal that her sentence is substantively unreasonable.

This court reviews the substantive reasonableness of a defendant's sentence for an abuse of discretion. *United States v. Dachman*, 743 F.3d 254, 263 (7th Cir. 2014). Where, as here, the district court sentenced the defendant to a within-guideline range sentence, there is a presumption of reasonableness. *Id*. "[S]o the burden [Ogletree] must overcome to prove its unreasonableness is a hefty one." *Id.*

In attempting to overcome this hefty burden, Ogletree makes passing reference to several facts she claims the court failed to properly weigh. She notes that she was sentenced

based on the intended losses and not the lower actual loss; that she had no role in selecting the tax refund amounts sought; that "her primary source of remuneration came in the form of fixed tax preparer fees," while Robtrel benefitted from the scheme by receiving the large tax refund amounts; and that only 19.3% of the fraudulent returns were filed while she was a member of the conspiracy. The district court, though, expressly addressed Ogletree's argument for a lower sentence based on her role compared to Robtrel's, and in fact gave her a lower sentence. (Robtrel received a higher sentence—74 months—and he had also accepted responsibility and pleaded guilty.) In explaining its sentence, the district court also highlighted that Ogletree was involved in the scheme "in a time period when the highest loss amount occurred," and as "the one with the EFIN and the tax preparer knowledge," she was "instrumental to this scheme going forward." The district court's explanation more than adequately showed that it properly weighed the nature of the offense and Ogletree's role in it.

That leaves Ogletree's main challenge to the substantive reasonableness of her sentence: She maintains that the district court failed to give proper weight to her *extraordinary* familial circumstances, namely her role, prior to her incarceration, as the primary caregiver to her two teenage sons and her teenage nephew. While this court has recognized that giving "short shrift" to the possibility of "extraordinary hardship" on one's family is a sound basis to remand for resentencing, *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008), there were no such extraordinary hardship in this case. In *Schroeder*, the defendant was the primary caregiver for his daughter who had

a severely compromised immune system, rendering child care almost impossible if he were incarcerated. There were no analogous extraordinary hardship at play here. Yes, Ogletree cared for her children and nephew and they suffer emotionally from her incarceration. But there is nothing to take this case outside the normal realm of hardship all children suffer when a caregiving parent is incarcerated. To the extent there was a hardship, the district court took that into account, allowing Ogletree to delay the start of her sentence to allow her to make arrangements for the children. Under these circumstances, there was no abuse of discretion in sentencing her to 51 months' imprisonment.

## III.

A jury convicted Ogletree of tax fraud and at sentencing the government presented sufficient evidence to establish, by a preponderance of the evidence, that the intended loss for her offenses was between $1,000,000 and $5,000,000. The district court did not clearly err in relying on that evidence and in setting her offense level at 51–63 months' imprisonment based on that loss amount. The district court also did not abuse its discretion in sentencing Ogletree to 51 months' imprisonment. The district court more than adequately considered the § 3553 factors and there were no extraordinary familial circumstances to justify a below-guideline sentence. We AFFIRM.