NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 15, 2016
Decided December 13, 2016

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 16-1419

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 12 CR 521-1 |
| GILBERT FREEMAN, *Defendant-Appellant*. | Elaine E. Bucko, *Judge*. |

**O R D E R**

Gilbert Freeman pleaded guilty to five counts of wire fraud, prohibited by 18 U.S.C. § 1343, based on his participation in a large-scale scheme that bilked hundreds of people out of their savings by pretending to assist them in selling their timeshares. At sentencing, the district court applied a four-level enhancement under U.S.S.G. § 3B1.1(a) based on his role as an organizer or leader of the criminal activity. Freeman challenges that determination, arguing that the court based its decision on evidence that was neither reliable nor sufficient to show that he had the required power to coerce or control the scheme's other members. We affirm.

**I**

Between 2008 and 2012, Freeman (known as Brett to his friends) participated in a scheme to defraud owners of timeshare properties in Mexico. The scheme was built upon multiple fictitious companies, including some that purportedly worked with corporate buyers to sell timeshare properties, and a fake escrow company. One set of employees ("lead generators") would call timeshare owners from Mexico, using a U.S.-based phone number, pretending that they worked for a U.S. business that facilitated timeshare sales. (Timeshares are notoriously difficult to unload.) The lead generators would try to convince the timeshare owners to sell their properties to a corporate buyer; they never mentioned that this buyer was fictitious. If a lead generator sparked a timeshare owner's interest in selling, then another set of employees ("liners") would call the owner and, using a script, tell the owner that the process of selling the property required an initial reimbursable payment. After the initial payment, a third set of employees ("closers") would again call the timeshare owners and try to convince them to pay a variety of fake Mexican closing costs, fees, and other taxes, with a promise that these costs would be refunded at closing. A fourth group of employees convinced victims that they worked for an independent escrow company that was holding all of the reimbursable funds. The timeshares were never actually sold, and none of the costs or fees were ever refunded. By the government's estimate, more than 1,400 victims were defrauded out of more than $4.8 million. The government estimated that over the course of the scheme, dozens of people contributed to the fraudulent activities, with as many as 15 employees actively working at one time.

Based on this scheme, Freeman was charged with 13 counts of wire fraud under 18 U.S.C. § 1343. He pleaded guilty to five of those counts pursuant to a plea declaration. At his change-of-plea hearing, Freeman admitted that his role in the scheme included obtaining lists of timeshare owners, helping to create websites and advertising for the fake companies, and opening bank accounts for these companies into which victims would transfer money.

According to the government, these admissions significantly understated Freeman's role. At sentencing it presented evidence showing that Freeman, along with another person named Moe, led the scheme. The evidence included email conversations between co-schemers, grand jury testimony from co-defendants and other former employees, and statements in co-defendants' plea agreements. This evidence showed that Freeman presented himself to others as being in charge of the organization and that employees viewed him as their boss. It suggested that he handled employee complaints and adjusted employee pay. The evidence also showed that Freeman had the power to

recruit employees, hire contractors, direct employees' actions, and approve inter-office procedures. Freeman and Moe received the largest cut of the profits.

In the Presentence Investigation Report (or PSR), the probation officer recommended a four-level enhancement under U.S.S.G. § 3B1.1(a) based on Freeman's role as "an organizer or leader of a criminal activity that involved five or more participants." (The PSR essentially adopted the government's version of the events, because Freeman, following his counsel's advice, did not talk about the offense during his presentence interview and did not submit a written explanation of the events.) That enhancement raised Freeman's total offense level from 33 to 37, which, together with a criminal history category of I, yielded a recommended guideline range of 210 to 262 months. Without the adjustment, his range would have been 135 to 168 months.

In Freeman's initial sentencing memorandum (prepared by former counsel), he agreed with the probation officer's position that he had been a leader in the scheme:

> We agree with the PSR writer that … the enhancement for a leadership role is correct. (Mr. Freeman now understands that the enhancement does not only apply to the leader, Moe Aguilar, who invented this scheme and then brought Freeman into it, but understands that it is also applicable to a co-leader, which he acknowledges he was).

Freeman later obtained new counsel and retracted his earlier acceptance of the leadership adjustment. His new counsel argued that the four-point increase was inappropriate because there was no evidence that Freeman had exercised authority or control over others. Counsel also argued that the leadership enhancement was largely based on unreliable evidence, namely, statements taken from the plea agreements of Freeman's co-defendants. He complained that Freeman had not had an opportunity to test the reliability of these statements.

In the first sentencing hearing (which was continued for further preparation related to another sentencing adjustment), the district court agreed with the government and the probation officer that the evidence showed that Freeman was a co-leader of the scheme:

> [T]here is lots of evidence there [that Freeman was a leader]. … [T]he evidence is totally consistent that he was the leader of this. … [E]very single person who has either pled or given a statement has said the same thing [that Freeman was the co-leader].

The judge also said that she was "entitled" to rely on the evidence provided by the government, even though it included co-defendants' statements that were not subject to cross-examination, as the "rules of evidence do not apply in a sentencing hearing." She agreed with the government that if Freeman wanted to contest the adjustment, he had to "do more than just deny" that he was a leader. After listening to arguments on the point, the judge found that Freeman was a leader; as support for that finding, she singled out evidence "in the PSR … as well as what counsel for the government" stated. She also deemed it significant that Freeman previously had agreed that he was the co-leader. At the second sentencing hearing the judge noted that she had looked into the issue further and concluded that "there is certainly plenty of evidence to support the probation office's conclusion that [Freeman] does merit the leadership enhancement."

After she settled on the proper guidelines range, the judge considered the factors outlined in 18 U.S.C. § 3553(c) and sentenced Freeman to 240 months' imprisonment.

## II

On appeal Freeman challenges only the court's decision to apply the leadership enhancement. He focuses on both the alleged unreliability of the evidence on which the court relied, and more generally on the sufficiency of the evidence in support of the enhancement. The evidence was unreliable, he says, because it consists primarily of grand jury statements and plea agreements of "biased" co-defendants and is (in his view) "unsubstantiated hearsay without corroboration." Neither of those points goes anywhere. A court may use any evidence at sentencing, as long as it is sufficiently reliable, even if it would be inadmissible at trial. See *United States v. Tankson*, 836 F.3d 873, 881 (7th Cir. 2016); *United States v. Isom*, 635 F.3d 904, 907–08 (7th Cir. 2011); *United States v. White*, 639 F.3d 331, 338 (7th Cir. 2011). A defendant is entitled to challenge the information's reliability, but if he offers only a bare denial of that information with nothing more (which is all that Freeman has done), then the government has no obligation to bolster its reliability. See *United States v. Williams-Ogletree*, 752 F.3d 658, 664 (7th Cir. 2014). Freeman also argues that he was deprived of the chance to show that the information was unreliable because he could not cross-examine the co-defendants about their statements. That would concern us more if Freeman had offered any reason to doubt the reliability of the co-defendants' testimony. But he has not, and without such evidence, the district court was free to rely on those statements. *Id.* As the government points out, the statements of the various co-defendants were not inconsistent, and some of the information was corroborated by other evidence, including emails and statements of other employees.

Next Freeman argues that the evidence was insufficient to establish that he was a "leader" as that term has been interpreted under U.S.S.G. § 3B1.1(a). He contends that a defendant must exercise control and authority over others for the leadership adjustment to apply and that no evidence shows that he had any ability to coerce or direct any other participant in the scheme. This interpretation of U.S.S.G. § 3B1.1(a) is incorrect. While the question of a person's control over others is an important factor in determining whether the person is a leader, the focus of the inquiry is on the relative culpability of the defendant as compared to others involved in the scheme. A more culpable defendant "ought to receive the harsher organizer/leader enhancement." *United States v. Weaver*, 716 F.3d 439, 442 (7th Cir. 2013); see also *United States v. Vasquez*, 673 F.3d 680, 685 (7th Cir. 2012); *United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009). In evaluating a person's role in a scheme, the court may consider all of the factors listed in Application Note 4 of § 3B1.1, including

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 Application Note 4; *United States v. Cooper*, 767 F.3d 721, 733 (7th Cir. 2014); *Weaver*, 716 F.3d at 443.

The government's evidence touched all those bases. Freeman made decisions about company management; he used his name for many of the fake companies and bank accounts required to run the scheme; he recruited other members; he and Moe received the largest share of the profits; he was included in many emails about top management decisions; he participated in the scheme over the course of several years and across international borders; and he was viewed by others in the scheme as having control. Substantial evidence showed that Freeman exercised actual control over other people. He controlled aspects of employee payment, gave employees specific tasks to complete, and, along with Moe, held veto power over operating procedures. "[A] defendant exercises control and authority over another when he 'tells people what to do and determines whether they've done it.'" *Weaver*, 716 F.3d at 443 (quoting *United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012)).

Because Freeman has failed to show either that the evidence supporting the leadership adjustment was insufficient or unreliable, or that there were any procedural flaws in the sentencing process, we AFFIRM the judgment of the district court.